**Alf LARSEN, Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant.**

**No. 6381.**

United States District Court
W. D. Washington, N. D.

July 30, 1965.

459

Allen, DeGarmo & Leedy and Seth W. Morrison, Seattle, Wash., for plaintiff.

Evans, McLaren, Lane, Powell & Moss, by Gordon W. Moss, Seattle, Wash., for defendant.

TAVARES, District Judge.

This case was originally commenced in the King County Superior Court of the State of Washington by Alf Larsen, a resident and citizen of the State of Washington, against Insurance Company of North America, a corporation qualified to do, and doing business in the State of Washington, but having its principal office in and being a citizen of the State of Pennsylvania. It was duly removed by the Defendant to the United States District Court for the Western District of Washington, Northern Division.

On the basis of the files and records of this case, the Pretrial Order, and certain facts stated in the Affidavit of Counsel for the Defendant, said Defendant moved to strike certain contentions of the Plaintiff set forth in the Pretrial Order, on the general grounds that they were insufficient to sustain a recovery as a matter of law. The facts, insofar as they are essential to the determination of the Motion, will be hereinafter stated.

On July 23, 1965, having duly heard oral argument on the Motion, after reading the extensive briefs of counsel for each party, and having orally indicated its ruling sustaining the main grounds stated in the Defendant's Motion, the Court announced that in view of its rulings on the main contentions, the Court would also consider the Defendant's Motion to Strike as a Motion for Summary Judgment, dispositive of the entire case. However, the Court at the same time required of the Plaintiff an offer of proof as to the remaining minor issues of fact, if any, considered by Plaintiff essential to a complete and final determination of the entire action. Plaintiff's counsel having responded and stated what he would expect to be able to offer as to the few minor factual issues remaining undisposed of, and as to what might be established by those facts alone in the light of rulings of the Court on other facts and on Plaintiff's other contentions, the Court thereupon announced its intention to dismiss the action as upon Motion for a Summary Judgment, and its intention to file a written decision along the lines of the Court's oral remarks. The following is the Court's formal decision upon said Motion to Strike and Motion for Summary Judgment.

Jurisdiction by virtue of citizenship and by reason of the amount in controversy exceeding $10,000 is vested in this Court pursuant to 28 U.S.C.A., Section 1332. On May 3, 1962, the Defendant issued to Ray Furfiord and Point Chehalis Packers, Inc. its marine open cargo policy of insurance, insuring said assureds on shipments of cargo to be thereafter made against the perils, and in accordance with the terms and provisions, set forth in the policy.

This type of marine open cargo policy is designed to continue indefinitely until cancelled by either party, and coverage of various vessels and cargos and additional assureds from time to time thereafter is effected by adding riders and/or making additional endorsements which are attached to, and/or written and/or stamped upon the policy.

The policy was issued through an independent insurance brokerage firm or agent, LaBow Haynes Company, Inc., Agents. The policy itself purports to state, in paragraph 42 on page 8 thereof,

"42. It is a condition of this Policy, and it is hereby agreed that the Assured's brokers, LaBOW, HAYNES COMPANY, Dexter Horton Building, Seattle, Washington, or any substituted brokers, shall be deemed to be exclusively the agents of the Assured and not of this Company in any and all matters relating to, connected with or affecting this insurance. Any notice given or mailed by or on behalf of this Company to the said brokers in connection with or affecting this insurance, or its cancellation, shall be deemed to have been delivered to the Assured."

The policy among other things initially insured the original assureds upon shipment of lawful goods and/or merchandise consisting of canned and/or frozen salmon and crab meat, and cannery supplies and materials, made by or to the assured for their own account as principals or as agents for others, etc. The type of conveyance to which this insurance attached included conveyance by metal self-propelled vessels and connecting conveyances and fishing vessels, and the area of the voyages covered included places at and from Puget Sound ports and/or places to ports and/or places in Alaska and vice versa. It was stated that cannery supplies and materials would be valued at amount of invoice including all charges therein stated plus ten percent, and "Processed CRAB MEAT AND SALMON valued at Seattle, Washington market value on date of shipment."

To this policy, as contemplated by the terms thereof, there were apparently added from time to time notations and additional pages or stickers in chronological order commencing June 6, 1962, which will be hereinafter more particularly noticed. The last two of these addenda to the policy apparently were made on April 28, 1964, "Effective May 1, 1964," and on May 15, 1964 "Effective May 13, 1964," respectively, the former insuring the original assureds in respect of the D/V "Aleutian Reefer," and the latter naming Plaintiff Alf Larsen as an additional assured with respect to cargo aboard that vessel. This diesel powered vessel was operated by Roy Furfiord and Harry Furford, copartners doing business as Polar Fisheries, as a refrigerated motor vessel employed in the procuring, freezing and transporting of salmon in and from Alaska to the State of Washington. On July 10, 1964, Yukon King, Inc., a processor and packer of mild-cured salmon, near the mouth of the Yukon River, Alaska, shipped twenty-one tierces (large barrels) of mild-cured salmon aboard the D/V Aleutian Reefer for delivery in Seattle, Washington, to the Plaintiff, Alf Larsen. Upon arrival of the vessel at Seattle, the twenty-one tierces of mild-cured salmon were discharged from the vessel, but when they were opened, it was found that the contents of eleven of the twenty-one tierces were so spoiled as to be condemned by the health authorities as unfit for human consumption, and were a total loss except for the proceeds of salvage, amounting to $43.00. These twenty-one tierces were owned by Yukon King, Inc., but subject to a security interest in Alf Larsen, Plaintiff, for the amount of his financing of the fishing and packing operations of Yukon King, Inc., and Plaintiff also had the exclusive right to sell this pack as a fish broker and acted as agent for Yukon King, Inc. These twenty-one tierces of salmon had been packed on various dates between and including June 28 and July 5, 1964, and had been transported from the fishing camp of Yukon King, Inc., to the location of the Aleutian Reefer at Sunshine Bay on an unrefrigerated power scow, the trip taking approximately seven hours, from which they were loaded on to the Aleutian Reefer on July 10. The twenty-one tierces were stored, as per agreement with Plaintiff at the time he arranged for the shipment, in the No. 1 hold of the Aleutian Reefer, with instructions to the officers of the vessel to carry the mild-cured salmon at not above 40° Fahrenheit, and apparently the Captain or Master of the vessel so instructed the Chief Engineer.

The No. 1 hold of the vessel was equipped with refrigeration machinery, the refrigeration plant for this hold being independent of the main engines of the vessel, so that the stopping of the main engines would not require shutting down the refrigeration machinery for the No. 1 hold.

The shipment of the twenty-one tierces was declared to the defendant insurance company by LaBow Haynes Company, Inc., on August 6, 1964, and the premium for such shipment was paid to the Defendant. A copy of the insurance policy with all attached addenda or riders was attached to the Pretrial Order as Exhibit 1, and a copy of the declaration was attached to the Pretrial Order as Exhibit 2, and in addition the Court has had the benefit of examining a duplicate original of the policy showing the actual attachments, writings, notations, etc., including clauses stamped in red ink, and typewritten and handwritten notations in ink, which are not clearly indicated in the photographic copy of the policy attached to the Pretrial Order. Some of these attachments, notations or stamped portions, etc. will be specifically discussed later, indicating their significance.

It is apparent from the stipulated facts in the Pretrial Order that the spoilage of the eleven tierces has no significant relationship to the dates on which each tierce as packed, that is to say, some of the tierces that did not sour were packed as early as June 28, and as late as July 5, and, of groups of tierces packed on the same day, some turned sour and some did not sour. Whether the tierces which

were stored on the bottom of the No. 1 hold, and which would be the ones that were partially flooded, as hereinafter described, were the ones that soured cannot be proved by any available evidence. Other tierces of salmon, not involved in this case, packed and shipped by the same packer, Yukon King, Inc., during this same season, and about this same time by barge unrefrigerated for three or four days, and then loaded aboard another steamship in St. Michael, Alaska, on July 1, arriving on July 17 in Seattle in good order, were not lost from souring, although they had not been under refrigeration at all from the time they left the plant and until arrival in Seattle.

It was also stipulated that:

"16. Mild-cured salmon packed in the lower Yukon River has frequently been shipped from the lower Yukon River to Seattle without refrigeration and has arrived in good and unsoured condition. Mild-cured salmon which has been properly processed and cured may be stored and kept up to at least three (3) years without spoilage, provided proper cool temperatures are maintained. Delay, alone, in the southbound voyage of the ALEUTIAN REEFER would not cause spoilage of the 11 tierces of salmon."

Before taking on the cargo of 21 tierces on July 10, 1964, the Aleutian Reefer departed Seattle for the Yukon on May 19, 1964; on May 22 one of its propellers struck a log, causing engine and/or tail shaft vibration; on June 15 the vessel anchored in Sunshine Bay inside the mouth of the Yukon and commenced processing fish and continued to do so until June 29, on which date a fire occurred in the engine room of the vessel. On July 11, 1964, the vessel departed Sunshine Bay and arrived at Seattle on September 4, 1964. During the south-bound voyage of the vessel, the following events occurred:

"(a) The ALEUTIAN REEFER stranded on a sand bar off Munson Island in the mouth of the Yukon River at 2:10 P.M. July 13, 1964. At 6:00 A.M. on July 14th, the vessel floated free of the sand bar on the morning high tide.

"(b) Plaintiff arranged for shipment of 108 half tierces of hardsalt King Salmon aboard the ALEUTIAN REEFER, which were loaded aboard the vessel while in the Yukon River, and some of which were loaded aboard the vessel in the Number One hold after departing Sunshine Bay. These tierces are not involved in this lawsuit.

"(c) The ALEUTIAN REEFER cleared the Yukon River bar July 15th and arrived at Sand Point, Alaska, on July 20, 1964. The vessel departed Sand Point for Kodiak on July 20th and arrived in Kodiak on July 23rd. The vessel experienced difficulty with the engines during this portion of the voyage and on July 21st, the port main engine was shut down and the vessel thereafter proceeded on its voyage running on one of its two main engines.

"(d) The ALEUTIAN REEFER remained at Kodiak from July 23rd until August 19th, when it departed for Seattle.

"(e) On August 24, when the vessel was nearing Ketchikan, Alaska, a sea suction pipe dropped off. As a result of this, sea water entered the bilges of the vessel and the Number One hold in which the tierces of mild-cured salmon were stowed. The water was thereafter pumped out of the vessel, and the sea suction pipe was repaired at Ketchikan on August 25th. The sea water did not itself penetrate through the tierces into the mild-cured salmon.

"(f) The ALEUTIAN REEFER departed Ketchikan on August 26th but returned to Ketchikan for repairs to the reduction gear. The vessel again left Ketchikan for Seattle on August 28.

"(g) The starboard main engine quit operating on August 31. The port main engine was started up but it quit operating on September 2, when the vessel was in the Georgia Straights. The vessel was then towed to Anacordes, Washington, arriving on Septem-

ber 2, and was thereafter towed to Seattle, arriving on September 4. The refrigeration plant for the No. 1 hold operated independently of the main engines of the vessel, and the stopping of the main engines do not require shutting down the refrigeration machinery for the No. 1 hold."

The sound market value in Seattle of Number One (highest grade) tierces of Yukon River mild-cured King Salmon was $800.00 per tierce at the time of shipment on July 10, 1964, and at the time Plaintiff's 11 damaged tierces of salmon were condemned after discharge from the vessel in September, 1964.

On October 29, 1964, Plaintiff submitted to LaBow, Haynes Company, Inc., Plaintiff's insurance broker, and on November 3, 1964 LaBow, Haynes Company, Inc. submitted to Defendant, a written claim under Defendant's policy above mentioned for loss of the 11 tierces of mild-cured salmon at $800 per tierce or $8,800.00, less salvage of $43.00, for a net claim of $8,757.00. Plaintiff's written claim of October 29, 1964, on the insurance policy did not contain a copy of any written claim by Plaintiff against the ocean carrier (D/V Aleutian Reefer and owners) nor, after receiving the claim on the policy did Defendant request Plaintiff to make written claim against the owners.

On December 11, 1964, Plaintiff filed suit against the ocean carrier to recover for the loss of Plaintiff's 11 tierces of salmon, by way of a counter-claim in King County, Cause No. 632192, in an original action brought by this ocean carrier against Plaintiff in the State Superior Court. Plaintiff did not give notice of said action or request Defendant to participate therein or pay Plaintiff's expenses of such claim against the carrier, until Plaintiff's present action against Defendant was commenced about January 25, 1965.

Under the heading "Disputed Facts," the Plaintiff's contentions are set out in the Pretrial order, and are quoted in the margin [1] in order to render more readily

---

1. That the loss of the salmon was caused by the temperature in the Number One hold in which the salmon were stored exceeding 40° Fahrenheit with sufficient frequency and for sufficient duration to cause the loss, which condition was the proximate result of one or more of the following events which constitute insured risks under the insuring policy.

 (a) A negligent vessel Master who failed to supervise his Chief Engineer in the maintenance of proper temperatures.

 (b) A negligent Chief Engineer who failed to maintain proper temperatures below 40°, although instructed to do so by the Captain; who failed to routinely observe and log the temperatures maintained in the vessel; who failed to follow the Captain's instructions; who failed to become familiar with and utilize the automatic temperature maintaining equipment aboard the vessel, and from whose general conduct and the other circumstances of the case, it may be inferred that excessive heat was probably permitted to accumulate in the fish hold. Coverage is provided under paragraph 24 of the policy for such faults of errors as follows:

 "This insurance is also specially to cover any loss of or damage to the interest insured hereunder, through the bursting of boilers, breakage of shafts or through any latent defect in the machinery, hull or appurtenances, or from faults or errors in the navigation and/or management of the vessel by the master, mariners, mates, engineers or pilots."

 (c) That the hold was flooded in Ketchikan, raising the temperature to approximately 56° to 58° in the hold, which flooding was due to the failure of a valve on a pipe leading from the bottom of the vessel into the hull, which failure constituted a peril of the sea under paragraph 11 of the insuring agreement which provides:

 "Touching the adventures and perils which this Company is contented to bear, and takes upon itself, they are of the seas, * * * and all other like perils, losses and misfortunes * * * that have or shall come to the hurt, detriment or damage of the said goods and merchandise, or any part thereof."

 And further constitutes a latent defect in the machinery, hull or appurtenances of the vessel under the above quoted paragraph 24.

understandable the various contentions in the above mentioned Defendant's motion to strike and motion for summary judgment.

(d) The log collision of May 22, the burning of the vessel on June 29, the stranding of the vessel on July 13, and the sinking of the vessel on August 24 caused such damage to the vessel and its engines as to prevent the engineer from giving proper or sufficient attention to the maintenance of prescribed temperatures in the Number One hold, and such events therefore either directly caused the loss or caused a derangement under the refrigeration insurance provision of the policy which provides:

"Whilst stowed in *Refrigeration Chambers* of vessel named herein this insurance is extended to cover all losses or damage due to or caused by derangement or breakdown of the refrigerating machinery and/or refrigerating plant and/or insulation."

2. That the declared value of the tierces upon which the premium was based and paid was $800.00 plus 10%, or $880.00 per tierce, and that the Plaintiff is therefore entitled to recover $9,680.00 less $43.00 condemnation salvage, or $9,637.00 for the loss of salmon, together with interest at 6% per annum from September 8, 1964, the date of initial proof of loss to the Defendant's surveyor.

3. That paragraph 34 of the insuring contract provides as follows:

"Should the right of recovery of the Assured be contested or denied by the aforesaid Carrier or Bailee, then this Company shall advance to the Assured the amount of the loss (otherwise recoverable hereunder) as a loan without interest pending a determination of Carrier's or Bailee's liability; the Company further agrees to bear all the expenses of any suit brought in the name of the Assured or of the owners of the insured merchandise, or otherwise to enforce the liability of the Carrier or Bailee. The repayment of the loan to the Company is conditional upon, and only to the extent of, any net recovery from the Carrier or Bailee received by the Assured or owner of the insured merchandise."

That pursuant to said provision, in King County, Washington, Cause Number 632192, the Plaintiff in this action made demand against R. C. Furfiord and Harry Furford, copartners d/b/a Polar Fisheries, as carriers and bailees of the damaged fish, for recovery thereof, which claim was denied by said parties. That this Plaintiff thereafter demanded by allegation in the Complaint in this proceeding and otherwise that the above-named Defendant advance to the Plaintiff the amount of the loss hereunder, and bear all of the legal expenses involved in proceeding against the carrier. The Defendant has failed and refused to advance said loan and to undertake enforcement of the liability against the carrier, as a result of which the Plaintiff has been damaged by the necessity of expending funds in legal expense and costs in the King County proceeding as well as in these proceedings in a continuing amount, the total of which will be proved at time of trial and dependent upon further proceedings herein.

4. That the mild-cured salmon shipped aboard the ALEUTIAN REEFER was of good quality, equivalent to or better than the quality of the 46 tierces which were shipped by Alaska Steamship in 1964 to Seattle without loss and the 301 tierces which had been packed and shipped from the mouth of The Yukon to Seattle by Yukon King, Inc. from 1959 through 1963 with the loss of only one (1) tierce.

5. That under the terms of the insurance policy, to-wit:

"Warranted free from Particular Average, under 3% on each shipping package, unless the vessel or craft be stranded, sunk or burnt * * * "

all partial losses in excess of 3% of each package are covered, if the loss is caused by an insured risk, and the loss of each of the tierces in the present case was total.

6. That the insurance contract issued by the Defendant, through its issuing agent, LaBow, Haynes, Inc., is so ambiguous, conflicting and incomprehensible as to require strict construction against the Defendant, and as to entitle the Plaintiff to the most favorable interpretation and application of language appearing therein.

7. The failure of the crew to properly operate the refrigeration machinery constitutes a derangement of that machinery as that term is used in the above quoted refrigeration provision.

8. That even if the insurance contract is interpreted as not insuring partial losses, the insurance coverage in the present case was apportionable as each tierce was declared at $800.00 per tierce plus 10% and each of the damaged tierces were totally destroyed, therefore not falling within the alleged partial loss exclusion of the policy.

The first ground of Paragraph 1 of Defendant's Motion to Strike seeks to strike Plaintiff's "contention of recovery" based upon negligence of the crew in failing to maintain proper temperatures (Plaintiff's contentions Nos. 1(a), (b) and 11).[2] Defendant contends that negligence of the vessel's crew in failing to maintain proper temperatures in the cargo holds below 40° Fahrenheit does not constitute "faults or errors in the navigation and/or management of the vessel" by the Master, mariners, engineers or pilots within the meaning of Clause 24 (Inchmaree clause)[3] of the policy.

The Court holds, in agreement with Defendant's contention, that the term "faults or errors in the navigation and/or management of the vessel by the Master, mariners, mates, engineers or pilots," as used in this clause 24 of the policy and relied on by Plaintiff in his contentions 1(a) and 1(b) and 11 is a term

9. That the policy specifically covers " * * * value of any package or packages which may be totally lost in loading, *trans-shipment* or discharge * * *" and the tierces constituted packages which were lost during trans-shipment from the fishing camp in Alaska to the dock in Seattle.

10. That compliance with that portion of the policy which provides under the "'Refrigeration Insurance" provision as follows:

"It is warranted by the Assured: That claim will be immediately filed in writing against the vessel or other carrier, a copy of which must accompany any claim presented under this insurance."

has been either complied with or waived under the following circumstances.

(a) Claim has been made against the carrier and suit commenced, a copy of which has been submitted to the Defendant accompanying a claim under this policy.

(b) Defendant rejected the Plaintiff's claim on the sole ground that the loss was not caused by a risk insured against, so the submission of any additional material in connection with a claim against the vessel would have been a futile, useless gesture, and therefore not required under the law.

(c) That the submission of a copy of the claim is a non-prejudicial condition which can be met at any time, and is not a condition precedent.

(d) That neither the Defendant, nor the Defendant's agent, LaBow, Haynes, Inc., requested or in any manner made known to the Plaintiff that such a claim should be submitted and was not in fact waived as an unnecessary formality.

(e) That the Defendant has not in any manner been prejudiced by the time and manner of filing claim against the carrier or the time or manner of forwarding a copy of such claim to the Defendant, as all of the Defendant's rights, and the Plaintiff's rights, if any, against the carrier have been wholly preserved.

(f) Compliance is excused as a matter of law because the vessel or carrier involved is a co-insured under the policy issued by the Defendant to the Plaintiff, and Defendant could not thereby proceed against the carrier.

11. The undertaking of the Defendant insurance company under paragraph 24 (Inchmaree Clause) of the insurance policy

"This insurance is also *specially to cover any loss of or damage* to the interest insured hereunder * * *"

makes the three free of particular average clauses in the contract wholly inapplicable to losses caused by risks covered under the Inchmaree Clause, including latent defect of machinery, hull and appurtenances and fault or errors in the navigation or management of the vessel.

2. The Plaintiff's contentions so referred to are quoted in Note 1, ante.

3. This clause, on page 6 of the policy, under the heading "America Institute Cargo Clauses," reads as follows:

INCHMAREE 24. CLAUSE (April 1947) This insurance is also specially to cover any loss of or damage to the interest insured hereunder, through the bursting of boilers, breakage of shafts or through any latent defect in the machinery, hull or appurtenances, or from faults or errors in the navigation and/or management of the vessel by the master, mariners, mates, engineers or pilots.

of art derived from the Harter Act[4], and the Carriage of Goods by Sea Act (hereinafter called COGSA),[5] which acts deal with the rights, liabilities and immunities of ocean carriers for cargo loss and damage, and from the usages of the shipping industry in connection with shipping generally and the construction of those terms as used in one or the other or both of these Acts.

As such, the term "navigation or management" of the ship seems to have been construed pretty consistently not to include negligence in the care and custody of cargo,[6] since both Acts, by other provisions thereof, obligate the carrier to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." Sec. 3(2), 46 U.S.C.A., Section 1303(2) and (8); for same

4. Sec. 3 of the Harter Act, enacted in 1893 (46 U.S.C.A. § 192) provides if the vessel owner exercises due diligence to make the vessel seaworthy, the vessel owner shall not be liable for damage or loss resulting "from faults or errors in navigation or in the management of said vessel."

5. Sec. 4(2) (a) of the COGSA, enacted in 1936, 46 U.S.C.A. § 1304(2) (a) provides that:

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship; * * *".

6. 1 Carver, on Carriage by Sea, 11th ed. 1963, secs. 145–153, especially Sec. 151; 2 British Shipping Laws pp. 123–130, especially p. 128, reading:

"But the negligent act or omission must have relation to the vessel. Faults or errors in taking care of the cargo, apart from any working of the vessel, are not excused. Thus, allowing oil which had leaked from barrels to remain in the bilges and damage other cargo; failure to open hatches to ventilate cargo; leaving hatches open for ventilation of cargo in consequence of which water entered and damaged the cargo, were held in American cases not to be faults 'in the management of the vessel' within section 3 of the Harter Act, but to be faults 'in the care and custody of the cargo,' for which the owner was responsible under section 1."

Robinson on Admiralty (1939), pp. 515–526, especially pp. 515 and 520, especially 515, reading:

"Since a shipowner's liability for damage due to unseaworthiness is the greater the shipper's interest is to make the damage appear to be due to that cause rather than a result of error in navigation or management of the vessel. There are many close decisions. Since the carrier's exemption from liability is confined to the faults of his servants in navigating or man-

aging the ship, and does not extend to their negligence in handling the cargo, there are equally close decisions in these distinctions."

Gilmore & Black, The Law of Admiralty (1957) pp. 133–138, especially p. 134, reading:

"The cases which have defined the scope of the exemption from liability for negligence in the navigation and managment of the ship have mostly been concerned with deciding whether a given fault is to be classified as of this sort or is to be regarded as one having to do with the custody, care, etc., of the cargo, for which the carrier is liable. Since the line that has to be drawn in the case governed by Cogsa is the same as that under Harter, the Harter Act cases are important not only for the construction of that Act itself but also for the direct help they give in pinning down the distinction, in Cogsa, between a Section 3(2) liability and a Section 4(2) (a) immunity. The somewhat different phraseology has never been thought to carry any material difference in meaning.

"The difficulty in drawing the line arises from the fact that, read naturally, the two clauses overlap, for many actions which might be spoken of as faults or errors in management or even in navigation might equally well be viewed as failures in the duty to use due care with respect to the cargo. Few clearcut concepts have appeared for dealing with the problem; the feel of it can only be acquired by reading cases."

Dover, Analysis of Marine & Other Insurance Clauses (1960) 269.

"It can probably be assumed that 'management of the ship' has a similar meaning as in British law and has no relevance to management as it affects the cargo, e. g., the leaving open of hatch covers during inclement weather with consequent damage to cargo thereby exposed."

The Samland, (S.D.N.Y.1925), 7 F. 2d 155, 157.

The Jean Bart (S.D., Calif.1911), 197 F. 1002, 1005–1006.

obligation in substance under Harter Act, see 46 U.S.C.A. §§ 190, 191.

 This being the case, the familiar canon of construction applies that when a term has come to have a technical or special meaning, it will be presumed to have been used in a contract to express the same meaning, unless there is evidence of a contrary intent.[7]

No competent substantial evidence to overcome this presumption of use of technical terms in their technical sense has been presented or offered.

As indicated by some of the authorities previously cited, the only difficulty in this connection arises in determining whether a particular act or fault was committed in the "navigation or management of the ship" or in the "care and custody of the cargo." [8]

As indicated by the contentions quoted ante in Note 1, the Plaintiff among other things contends that through negligence

---

7. "The rules governing the construction of contracts in general usually apply to the construction of a policy or contract of insurance. * * *

"The rules governing the construction and interpretation of contracts generally, as discussed in [17A C.J.S.] Contracts §§ 294–325, usually apply in construing policies or contracts of any of the various kinds of insurance, at least where the language used is plain, clear, explicit, and unambiguous; * * *. The rule that insurance contracts are to be interpreted in favor of insured and against insurer, discussed infra § 297, has been said to be an exception; but, as that rule rests on the idea that the policy or contract of insurance is prepared by the company and is applicable only where the contract is ambiguous or of doubtful and uncertain meaning, it is in fact in accord with the general rule that an ambiguous contract prepared by one party alone will be construed most strongly against him, as discussed in Contracts § 324.

"The general rules of construction, however, are subject to special rules or principles evolved by the peculiar character of insurance policies and the exigencies of the insurance business,[11] and to rules or provisions of law affecting insurance contracts."

44 C.J.S. Insurance § 289, pp. 1136–1138.

Note 11 to the foregoing text well expresses the rule thus:

"*Marine insurance*

"(1) The interpretation of a marine insurance policy is not a question of morals or of public policy, and *the important thing is to secure uniformity of an interpretation in a commercial world embracing more than one continent and more than one ocean.*—Queen Ins. Co. of America v. Globe & Rutgers Fire Ins. Co., D.C.N.Y., 278 F. 770, affirmed, C.C.A., 282 F. 976, affirmed 44 S.Ct. 175, 263 U.S. 487, 68 L.Ed. 402." (emphasis added.)

Marine insurance is of ancient origin and developed into the system of insurance on premium from its early form of mutual insurance."

Id., § 31, p. 490.

"Technical words ordinarily will be taken in a technical sense. This rule has been applied by the courts, for example, to legal terms. On the principle that it is the intention of the parties which is to prevail, the language of a contract is to be given effect according to its trade meaning notwithstanding in its ordinary meaning it may be unambiguous. Courts infer that members of a vocation employ its trade terms in their technical sense whenever they use such terms in contracts, and unless clearly used in a different sense, technical words are to be interpreted as usually understood by persons in the profession as business to which they relate. Mercantile terms in mercantile contracts will be given the meaning which merchants ordinarily give them.

"On the other hand, the technical meaning usually ascribed to certain words and phrases is not controlling when they are clearly used in a different sense. Where on a consideration of the whole instrument it appears that technical words are employed in a sense entirely different from their technical meaning, the meaning in which they are employed will be adopted. Where technical words are employed by parties who are obviously unfamiliar with their meaning, they may be construed in such a manner as to effectuate the true intention of the parties."

17A C.J.S. Contracts § 302(1), pp. 148–149.

See, also, other authorities cited on pages 4–5 of Defendant's brief.

Giustina v. United States (D.C.Or.1960) 190 F.Supp. 303, 308.

8. Gilmore & Black, supra, § 3–29, pp. 134–135.

of the Master or his Chief Engineer, or both, the 11 tierces of salmon were caused to be spoiled by the temperature in the No. 1 hold exceeding 40° Fahrenheit, with sufficient frequency and for sufficient duration to cause the loss, and that this condition was the proximate result of one or more of the following events:

(a) negligence of the Master in failing to supervise his Chief Engineer in the maintenance of proper temperatures; (b) negligence of the Chief Engineer who failed: (1) to maintain proper temperatures below 40 degrees, although instructed to do so by the Captain; (2) to routinely observe and log the temperatures maintained in the vessel; (3) to follow the Captain's instructions; (4) to become familiar with and utilize the temperature-maintaining equipment aboard the vessel, and (c) from whose general conduct and *the other circumstances of the case* it may be inferred that excessive heat was probably permitted to accumulate in the the fish hold.

Except for the above underscored portion of these particular contentions referring to "other circumstances," it seems sufficiently clear to this Court under the authorities [9]—so as not to call for invocation of the rule that in case of ambiguity and doubt, the issue shall be resolved in favor of the Assured—that the faults here relied upon by Plaintiff related to the care and custody of the cargo, and not to the navigation or management of the ship.

█ As to the contention relating to the "other circumstances" the only other possibly relevant circumstances (as indicated later in this decision) which might possibly affect the spoilage of the cargo, would be: (1) the delays suffered by the vessel from various untoward events after it took on the cargo, none of which delays alone, however, according to the stipulated facts, would have caused this spoilage; (2) the misfortunes of the ship after taking on the cargo, namely, (a) the stranding on a sand bar on July 13; (b) the shutting down of the port main engine on July 21; (c) the dropping off of a sea suction pipe with a consequent partial flooding of the vessel, including hold No. 1; (d) the reduction gear trouble necessitating repairs at the end of August, and (e) the quitting of the starboard main engine on August 31, necessitating towage of the vessel thereafter.

None of these contingencies appears to have physically and directly affected the generator and/or refrigerating machinery, or made it actually and physically necessary to turn off the generator and refrigerating machinery for any reason having to do with the navigation or management of the ship as defined by the authorities, with the possible exception of the flooding of the hold when the sea-suction pipe dropped off (as to which more will be said later). Therefore, with this exception, since the generator could operate separately from the other engines and machinery used in the navigation and operation of the ship, and could have been allowed to remain on to preserve the proper temperatures in hold No. 1, clearly none of the above contingencies compelled the closing down of the generator or refrigerating system and therefore none of them caused damage to

9. See Authorities cited in Note 6, ante.
Eldridge on Marine Policies (2d ed. 1924) pp. 158–159, under title "Navigation."
1 Carver, supra, §§ 146–152, 2 British Shipping Laws supra, pp. 123–130.
Gilmore & Black, § 3–29, 3–30, pp. 134–139.
Barr v. International Mercantile Marine Co. (2 Cir. 1928) 29 F.2d 26, and cases cited pp. 28–29.
The Samland, (S.D.N.Y.1925) 7 F.2d 155.
W. T. Lockett Co. v. Cunard S.S. Co. (E.D.N.Y.1927), 21 F.2d 151.

The Rita Sister (E.D.Pa.1946) 69 F. Supp. 480.
The Jean Bart (S.D.Calif.1911) 197 F. 1002.
Andean Trading Co. v. Pacific S. N. Co., 2 Cir., 263 F. 559.
Schnell v. The Vallescura (1934) 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373.
The Bill (D.Md.1942) 47 F.Supp. 969, 979, affirmed Lorentzen v. Brazil Oiticica, Inc. (4 Cir. 1944) 145 F.2d 470.

the cargo by reason of actions taken in the navigation or management of the ship, either to meet the above-mentioned contingencies or otherwise. Clearly, then, any stoppage or imperfect functioning of the refrigerating machinery caused by the negligence of the ship's personnel in not properly attending to the operation of such machinery, related solely to the care and custody of the cargo.

As to the circumstance of sea water entering the hold due to the sea suction pipe dropping off, here again, even if it be proved that in this instance the generator or refrigerating machinery, or both, actually had to be turned off to meet this type of situation until the water was pumped out, which by no means is clear to this Court, it is clear from the facts admitted and the statements made to the Court, after the Court had offered Plaintiff's counsel an opportunity to make an offer of proof in this connection, that this incident alone, including the duration of the flooding situation—about nine hours—could not have caused the spoilage. Hence this Court must and does hold that all of the contentions in this connection above-mentioned are insufficient to constitute faults or errors in the navigation or maintenance of the ship and said allegations and contentions are therefore stricken, as insufficient to constitute a cause of recovery under the policy under the Inchmaree clause, paragraph 24 of the main policy.

In this connection the Court has given due consideration to the argument on page 8 of Plaintiff's Brief, pointing out that the American Institute Inchmaree Clause (September 8, 1959) recommends the following language for this clause:

> "This insurance also specially to cover (*subject to the Average Warranty*) loss of or damage to the subject matter insured directly caused by the following * * *" (Emphasis added)

and rejected the same on the ground that such revised form simply recognized and more literally expressed the result which would follow even without this literal recognition.

■ Paragraph 1(b) of the Defendant's Motion asks the Court to strike Plaintiff's contentions numbers 1(a), 1(b) and 11 upon the further ground that "the loss was a particular average loss and the policy must be construed to be warranted free of particular average losses caused by the Inchmaree clause perils (latent defect and negligence of the engineer, etc.)." In other words, it is contended by the Defendant that even if it should be held (contrary to the Court's holding supra) that the loss or damage was caused by any of the causes stated in the general Inchmaree clause (paragraph 24) such as latent defect in the machinery, hull or appurtenances, and faults or errors in the navigation and/or management of the vessel, nevertheless, under the general rider attached at the bottom of page 3 of the general policy, entitled "Refrigeration Insurance" and hereinafter referred to as the "Refrigeration Insurance Rider" which contains a warranty free from particular average (sometimes called the FPA warranty), Plaintiff is foreclosed from collecting any insurance on a partial loss of the cargo.

Before going into the question on the merits, this Court has determined that the Refrigeration Insurance Rider, as indicated by the manner in which it was attached to page 3 of the original policy, and not limited as to any particular vessel, cargo or assured, but simply inserted as the last part of section 12(b) under the typewritten subtitle "Refrigerated Cargo Insured," was intended to apply to *all* refrigerated cargo covered by the policy, and hence applied also to the D/V Aleutian Reefer and its cargo, including the 21 tierces of salmon, and to Alf Larsen as an additional assured. As such, it is binding upon him as Plaintiff in this case.

■ The relevant portions of this Refrigeration Insurance Rider are quoted in the margin.[10] The first sentence of

---

10. "Warranted free from Particular Average unless directly caused by the vessel being stranded, sunk, burnt or in collision with another ship or vessel or with ice or with any substance other than Water. Notwithstanding this warranty, the As-

this rider constitutes a free from particular average (FPA) warranty. To avoid further undue lenghthening of this opinion, the Court will quote only one general authority on the meaning of FPA clause, citing in the margin [11] a number of other authorities which further elaborate on the origin, purpose, and effect of this clause:

"The phrase * * * 'warranted free of particular average,' exempts the underwriter from liability for all partial losses, except as provided otherwise by the policy. Unless otherwise qualified, such a warranty does not restrict the insurance company's liability for total losses." 45 C.J.S. Insurance § 952 b(1), page 1144.

Of course the terms "free of particular average" and "free from particular average" are indistinguishable in their import, the latter being the language of the Refrigeration Insurance Rider herein discussed.[12]

There is no question in the Court's mind from a reading of the Refrigeration Insurance Rider and the authorities, that the 21 tierces of salmon, being refrigerated cargo, come squarely within this rider and its FPA warranty, and that, unless the Plaintiff can bring the loss of the 11 tierces into one of the exceptions—Plaintiff's contentions 1(d) see next paragraph—set forth in this rider, or recognized by law—e. g., total loss of an entire package or parcel separately valued and insured, or "apportionable" (Plaintiff's contention 8, note 1 ante)— this FPA warranty would prevent him from recovering for the loss of only a part of the 21 tierces.[13]

In an attempt to avoid this result, Plaintiff, among other things, makes several contentions: (1) that the loss of 11 out of the 21 tierces was "directly caused by the vessel being stranded, sunk, burnt * * *" (Plaintiff's contention 1(d)) within one of the exceptions to the FPA warranty in this Refrigeration In-

surers are to pay the insured value of any package or packages which may be totally lost in loading, transhipment or discharge; also to pay landing, warehousing and special charges if incurred for which Underwriters would be liable under a policy covering Particular Average.

"Whilst stowed in Refrigeration Chambers of vessel named herein this insurance is extended to cover all loss or damage due to or caused by derangement or breakdown of the refrigerating machinery and/or refrigerating plant and/or insulation. This insurance will further pay for deterioration caused by delay, and loss caused by a forced sale of cargo at an intervening port, if amounting to twenty-five ($25) dollars or ten per cent (10%) of the insured value of the entire shipment at option of the assured provided that such delay or forced sale is caused by the vessel stranding, sinking, burning or being in collision with another ship or vessel or is in consequence of a General Average Act.

This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the policy for the commencement of the transit and continues during the ordinary course of transit, including customary transhipment if any, until the goods are discharged overside from the overseas vessel at the final port." * * *

11. II Arnould on Marine Insurance (15th ed.) Secs. 878–881, 889–893, 894–895.
10 British Shipping Laws, pp. 843–846, 852–859.
Winter, Marine Insurance (3d ed. 1952), pp. 201–203, 235–238.
Gilmore & Black, supra, §§ 2–12 to 2–15, pp. 72–80 and § 3–47, pp. 168–169.
Pacific Creosoting Co. v. Thames & Mersey Marine Ins. Co. (W.D.Wash.1911) 184 F. 947, 948–949.
Dover, ante, pp. 142–143.
Eldridge, supra, pp. 160–161.
Poole, The Marine Ins. of Goods, Ch. II, Total Losses and Ch. III, Partial Losses (Particular Average, etc.) pp. 201–235.

12. See Note 10 supra.

13. California Canneries Co. v. Canton Ins. Office (1914), 25 Cal.App. 303, 143 P. 549, 553.
J. A. Jones Constr. Co. v. Niagara Fire Ins. Co., (4 Cir. 1948) 170 F.2d 667, 668–669.
Snare & Triest Co. v. Fireman's Fund Ins. Co. (2 Cir. 1919) 261 F. 777–778.

surance Rider;[14] (2) that the 11 spoiled tierces come within the special exception to this FPA limitation, being the second sentence of the Refrigeration Insurance Rider, which says "Notwithstanding this warranty, the Assurers are to pay the insured value of any package or packages which may be totally lost in * * * transhipment * * *" reading this in connection with the third paragraph of the Refrigeration Insurance Rider which provides that the insurance attaches from the time the goods leave the Warehouse, and/or Store at the place named in the policy for the commencement of the transit "and continues during the ordinary course of transit, including customary transhipment if any, until the goods are discharged * * * at the final port."

Elsewhere in this decision this Court holds adversely to the Plaintiff's foregoing contentions as to all of the various exceptions to the FPA warranty in the Refrigeration Insurance Rider, but at this point the Court will consider first the contention that the losses of the 11 spoiled tierces out of the total shipping package of 21 tierces involved herein can be recovered on the ground that each such tierce is a separate and "apportionable" package.

 It seems to be clearly recognized by the authorities that, "Where there is a total loss of an entire package or a parcel separately valued and insured, it is a total loss of such part, even though the article is within the memorandum, and insurer is liable." 45 C.J.S. Insurance § 952b(1), page 1144.[15]

Plaintiff has quoted the above excerpt in his brief, p. 11, with the following continuation of the above quotation:

"Where, however, goods of the same species are shipped, whether in bulk or in packages, not separately insured, the ordinary memorandum exempts the underwriters from liability for a total loss of part only, although consisting of one or more entire package or packages, and although such package or packages are entirely destroyed or otherwise lost by the specified perils. *This rule does not apply where the parties intend* that an entire loss of part of goods of the same species, shipped and insured in bulk, shall be treated as a total loss."

The emphasized portion of this quotation is particularly relied on by Plaintiff. However, an examination of the entire text of 45 C.J.S. Insurance § 952 a and b, and the authorities cited, pages 1143 to 1144, indicates that, in line with all other authorities this Court has been able to find, this intent is not a subjective one, but only to be determined by the terms of the policy and the manner of declaring the goods and the nature of the goods themselves. Here it is clear from the declaration of the goods, Exhibit 2, attached to the Pretrial Order, that the tierces were declared as 21 Full tierces of mild-cured salmon, valued at a lump sum of $16,800, along with other property not included in this case, and being included in a total of such other insured cargo with an addition of 10 percent, which was, as this Court believes, erroneous insofar as it applied to the 21 tierces. From this and the policy it seems clear that the 21 tierces of salmon were included as a single, unapportionable shipping package, and that the 11 tierces do not constitute an apportionable part of this package within the authorities. Hence the FPA clause of this Refrigeration Insurance Rider prevents the Plaintiff from recovering, if the above-mentioned other exceptions in said rider are not established. These additional exceptions will now be considered.

We here take up the Plaintiff's contention that notwithstanding the FPA warranty of the Refrigeration Insurance Rider, the loss of the 11 tierces was directly caused by the vessel being

14. See contention 1(d), ante Note 1, which seems to raise this contention somewhat indirectly; contention No. 5 also otherwise disposed of on other grounds.

15. See also Notes 11 and 13.

"stranded," "sunk," or "burnt," (Plaintiff's contention 1(d)) and first consider whether it was "burnt."

Although there was a fire aboard the vessel on June 29, no evidence is available or offered, and from the facts indicated in the Motion to Strike, the Pretrial Order, pleadings and briefs, and statements of counsel, it appears clear to this Court that no evidence can or will be produced to indicate any direct connection of cause and effect between the fire on board the vessel and the spoilage of the goods here concerned. Hence even if the fire can be considered as coming within the term "burnt" of the FPA clause of the Refrigeration Insurance Rider, Plaintiff cannot prove that the loss was "directly caused" by the vessel being so "burnt." Hence this contention should be stricken or denied.

As to the contention that there was a "sinking" or that the vessel was "sunk" within the meaning of said clause, it seems clear to this Court that there was not a "sinking" within the purview of that term as read in this clause. The word "sink" is defined by the Oxford Dictionary in its primary meaning, to mean "To become submerged in water; to go under or to the bottom (of ships); to founder." This is in line with the authorities available on this subject which hold that to be "sunk" or to come within the term "sunk" the vessel (or at least a steel vessel such as is here involved, as opposed to a barge so constructed out of wood or other buoyant material as to be incapable of being entirely submerged) must be sunk as far as it could sink under the surface of the water, and not just lying a little lower in the water than normal either from shipping water through leaks or otherwise, or from a heavier load or ballast.[16] Common sense requires something more than a mere shipping of 30 inches of water in the hold causing a ship to lay a little lower in the water than it otherwise would, but without touching bottom, to constitute a sinking, else the possibility of collecting insurance under this type of clause would be even greater than the perils ordinarily insured without the FPA limitation. Obviously, there was no "sinking" in this case.

As to whether there was a "stranding" of the vessel or whether it was "stranded," within the meaning of that term, as used in the FPA clause of the Refrigeration Insurance Rider, the Court holds that there was such a stranding and that this occurred after the vessel had taken on the cargo in question and while the cargo was still stored in the hold. Were this FPA warranty worded like the English type of FPA warranty set forth in the red-stamped FPA clauses considered elsewhere in this decision [17] a different result might follow, since under such circumstances proof of causation between the stranding and damage claimed might not be necessary in order to effect a waiver of the FPA limitation.[18] However, this particular clause requires that the damage be "directly caused by the vessel being stranded."

Here the proof of such cause is lacking. While it is an acknowledged fact that the vessel was stranded on a sand bar on July 13 for approximately 16 hours, until July 14, from the facts stated in the Pretrial Order and the statements of counsel in the briefs, and in the oral argument, it appears that this delay of 16 hours alone could not have caused the deterioration of the 11 tierces of salmon, but that a much longer time would have been required to cause the same, and that there will not be available any other evidence to prove that this stranding alone caused the damage. Hence there would be insufficient evidence to prove that the damage was directly caused by such stranding, and

16. Snare & Triest Co. v. Fireman's Fund Ins. Co. (2 Cir. 1919) 261 F. 777–778 Dover, ante, p. 143.

17. Gilmore & Black, supra, § 2–13, pp. 75–76.

18. Gilmore & Black, supra, § 2–13, pp. 75–76.

hence this claim must also be stricken or denied.

We next take up Plaintiff's aforesaid contention (See contention No. 9 quoted in Note 1 ante) to the effect that the loss is recoverable as the "value of any package or packages which may be totally lost in * * * transhipment * * *", under the Refrigeration Insurance Rider, and that the 11 tierces constituted packages which were lost during the transhipment from the Yukon King fishing camp in Alaska to the dock in Seattle. This contention Defendant, by paragraph 7 of its Motion, also moves to strike.

This Court does not find any authority for the proposition that "transhipment" is a word of art with any special, or broader meaning, than its normal customary meaning. Webster's New International Dictionary, 2d ed., defines "trans-shipment" as "act of trans-shipping, or transferring for further transportation, as goods, from one ship or conveyance to another." The Oxford Dictionary definition is "The action or process of transhipping or changing from one ship or other conveyance to another."

Plaintiff argues, in effect, that there is an ambiguity in the use of the term "trans-shipment" which requires it to be reconciled with other language around it, and that "The primary ambiguity appears to be that if the terms 'loading' and 'discharge' are given their full interpretation, the term 'transhipment' will be superfluous if given the narrow interpretation contended for by the Defendant." However, this begs the question by first assuming that "loading" and "discharge" *must* be given a very broad connotation in order to require that "trans-shipment" be given an unusual and extremely strained construction. There is ample room for each of the three terms to be given a normal effect without giving any one of them a strained and unnatural construction. Thus, as to a particular vessel, while it might be argued that there could be no trans-shipment of cargo without either loading it on, or discharging it from, the vessel, the cargo can be loaded and discharged without trans-shipment, as where the same vessel picks up goods from one dock, carries them the entire required voyage and discharges them at their final destination.

On the other hand, if the extreme coverage of the term "trans-shipment" contended for by Plaintiff is applied and carried to its logical conclusion as covering any damage that happens to the goods during any part of the carriage from wharf or lighter to vessel and to dock, such a construction would render unnecessary surplusage all other exceptions to the FPA warranty, including damage caused by stranding, sinking, burning, collision, derangement or breakdown of the refrigerating machinery, etc., and the FPA limitation would be meaningless, since all such damage would necessarily occur during the "trans-shipment" as so interpreted by Plaintiff.

The meaning contended for by Defendant, and adopted by this Court, appears to be the only reasonable and logical one, and is in accord with the normal usage of the term. The only case cited by Defendant (none, not even dictionary definitions being cited by Plaintiff) seems to be in accord. See Smith, Kirkpatrick & Co. v. Colombian S. S. Co. (5 Cir. 1937) 88 F.2d 392. The Plaintiff not having in his brief contradicted the same, the Court also assumes that Defendant has correctly quoted Gow, Marine Insurance (2d Ed. 1900) 187 Fn. 1 (not available to this Court) to the effect that "trans-shipment means generally the act of transferring goods from a vessel in which they have been carried to another vessel for the completion of their voyage."

If the fact that the 21 tierces were transported by a power scow, (a) not expressly mentioned in the insurance policy; (b) not owned or controlled by the insured vessel or the principal assureds named in the policy or even by Plaintiff, so far as the given and offered facts disclose; (c) from a place not named in the policy for the commencement of the transit, and (d) before the goods were "aboard" the Aleutian Reefer, can be con-

strued to render the initial loading of that cargo on that vessel a "trans-shipment," this still would not entitle Plaintiff to any recovery, since none of the tierces is shown by any given or offered evidence to have been lost in that "transshipment" (if it could be called that—a meaning which this Court rejects).

In his contention No. 6 (page 12 of Pretrial Order) Plaintiff appears to contend generally that the insurance contract is so "ambiguous, conflicting, and incomprehensible" in practically every aspect, as to require a strict construction against the Defendant and to entitle the Plaintiff to the most favorable interpretation and application of the language therein on each such aspect. This contention is disposed of by the observation that this Court finds that the insurance contract is not so ambiguous, conflicting and incomprehensible as to require the application of the rule of strict construction in favor of the assured and against the insurer. This being the case, it is unnecessary for the Court to consider the subsidiary question of whether, in issuing the policy, LaBow, Haynes, Inc. was the issuing agent of defendant, as contended by Plaintiff in this paragraph 6., notwithstanding the provisions of Section 42 of the policy, quoted at the beginning of this decision, which state to the contrary.

We come now to the contention contained in Plaintiff's contention 1(d), that all or some of the events alleged in said contention 1(d) "caused a derangement under the Refrigeration Insurance Provision of the policy." The Court has already pointed out ante that the facts admitted or which could be made available by any further evidence, would indicate only that the refrigeration machinery —which could have been operated perfectly and separately from other machinery of the vessel, the generator being designed to operate independently and to furnish refrigeration regardless of whether or not the ship's engines were shut down—was, with one possible exception, in perfect operating order and condition at all times during the voyage in question and could and would have functioned perfectly and kept the temperature down to the required level at all times, except for the alleged negligence of the ship's personnel in their failing to observe the temperatures at seasonable intervals, and failing to log the same, or failing to utilize automatic regulation equipment in connection therewith, which was available and not used, or in arbitrarily turning off the refrigeration machinery when not compelled to do so by any perils of the sea or other causes related primarily to the navigation or management of the vessel. With said possible exception, therefore, the machinery could not have been said to have been deranged, but the damage, if caused by improper refrigeration, would have been caused solely by the negligence of the Master, officers, etc. of the vessel in the care or management of the cargo, a condition disposed of ante. The possible exception is the approximate 9-hour period during which the vessel was flooded after the breaking off of the intake pipe caused by electrolysis and wear and tear. It is possible, though by no means clear, that this flooding might in fact have necessitated a turning off of the refrigeration machinery until the water was pumped out, due to possible complications if the machinery should continue to refrigerate when part of it was possibly immersed in water, or at least this flooding may have caused a derangement of the "refrigerating plant and/or installation." Assuming that this would be so, the Court afforded the Plaintiff's counsel an opportunity to make an offer of proof which would indicate that this possible derangement caused the loss or damage in question. This, Plaintiff's counsel was unable to do. Under the circumstances, this contention is also insufficient and must be stricken as contended in paragraph 6 of Defendant's Motion to Strike.

This Motion also requests striking paragraph 7 of Plaintiff's contentions, page 12 of the Pretrial Order, which contends that failure of the crew to properly operate the refrigeration machinery constituted a derangement. The word

derange is defined by Funk & Wagnalls Dictionary to mean "To disturb the proper arrangement or order of; bring into a state of confusion; disarrange; as, this deranges all my plans. 2. to disturb the natural functions of, as an organism; put into a disordered condition, as a machine; as, to derange the health of one's stomach. 3. to unsettle or unbalance the reason of; craze; as, he is deranged by trouble and losses." Obviously sense No. 3 is inapplicable. Sense No. 2 appears to be the one properly applicable to this particular set of facts. It seems to the Court that common sense requires a holding that, in order to be deranged, machinery must have some functional disorder in its own operation, as distinguished from a simple failure to operate at all or an operation at an improper or insufficient rate of production or operation, due solely to the manner in which human beings in charge of the same choose to operate or not to operate it. Hence the Court accordingly holds that there was no derangement of the machinery from the causes stated in contention No. 7, but that, even if there was such due to the flooding, it can not be proved that the damage was caused thereby.

Incidentally, it might be added that even if the periods of time of those few events which this decision holds might have possibly contributed to the spoilage in a manner covered by the policy, be added together, they could not alone, under the facts admitted or offered, be collectively shown to have caused the spoilage.

The Court has already decided, ante, that, even assuming that the perils covered by the Inchmaree clause (sec. 24) of the policy would, except for the FPA warranty in the Refigeration Insurance Rider, apply to the damage and causes for the damage which occurred, nevertheless, recovery is precluded by such FPA warranty. Nevertheless, this Court, before making that ruling, had already held ante that the faults or errors complained of were not those committed in the navigation or management of the vessel. Just in case this Court should be held to have erred in so construing and applying the said FPA warranty to preclude recovery under the Inchmaree Clause (Sec. 24), we proceed to determine whether the damage could conceivably be held to come within any other perils covered by the Inchmaree Clause.

■ The only other remaining peril contended by Plaintiff to be covered by the Inchmaree Clause is possible loss or damage caused through " * * * any latent defect in the machinery, hull or appurtenances" of the vessel.

Defendant's Motion, in paragraph 2. thereof, seeks to strike those portions of the Plaintiff's contentions (part of Plaintiff's contention 1(c) and contention No. 11) not only on the ground that the FPA clause precludes recovery (which we have already decided ante), but also on the ground that the flooding of the hold at Ketchikan was not the result of a "latent defect" as a matter of law.

Webster's Collegiate Dictionary defines "latent" as meaning "not visible or apparent; hidden; dormant," and goes on to say that "latent stresses concealment as of that which is present without showing itself." The Oxford Dictionary defines "latent" as meaning "present or existing, but not manifest, exhibited, or devoloped." Viewed superficially and literally applied, the term "latent" might be considered as possibly applying to the defect which existed with respect to the sea suction pipe which dropped off, causing flooding. However, it seems clear to this Court that the decisions on this particular subject have drawn a line, however fine, which stops short of the full literal connotation of the word "latent," as used in policies of this nature or as used in the same sense in COGSA (46 U.S.C.A. Sec. 1304(2)(p)), which statute exonerates the carrier and ship from "latent defect not discoverable by due diligence."

These decisions [19] have confined the term to a defect inherent in the metal itself or in the original basic material of which the part concerned is defective and latent in the sense that the defect is not one which could be discovered by any feasible test, even with the exercise of due diligence. An example, of course, would be such a basic weakness in a portion of the steel of the hull; or presumably, in a wooden vessel, in the lumber of the hull, as distinguished from a weakness which did not exist originally in the material from which the vessel or part was constructed, but which became weakened by chemical and/or electrolytic action or other wear and tear. Although the distinction is a fine one, it seems to the Court that the authorities have laid down sufficient guides to enable this Court to determine as a matter of law whether, in this case, the weakness of the suction pipe which broke off was, or was not, caused by a latent defect.

There is no evidence available or offered which would show that the breaking off of the suction pipe was due to any sudden action of wind and/or wave which caused it suddenly to collapse from any unusual strain imposed on a part weak from any inherent or other defect in the metal, but rather the only evidence expected to be adduced would indicate that the weakness in the pipe was caused by gradual action of the sea water, electrolysis, galvanic action or corrosion over a substantial period of time—from several months to several years—similar to other processes of wear and tear. Moreover, there is no proof offered or indicated in the Pretrial Order or the record, or offered by Plaintiff, to indicate that the defect in the suction pipe was inherent in the original metal and latent or that such falling off of the suction pipe was such an unusual occurrence as to give rise to some sort of reasonable and legal presumption or inference that it must be attributable to something more than wear and tear, if such a presumption or inference could be indulged in.

In his contentions 1(c) and 11, Plaintiff contends that the flooding due to the failure of the suction pipe constituted "a peril of the sea" under paragraph 11 of the insuring agreement, which reads as follows:

"PERILS. 11. Touching the adventures and perils which this Company is contented to bear, and takes upon itself, they are of the seas, fires, assailing thieves, jettisons, barratry of the master and mariners, and all other like perils, losses and misfortunes (illicit or contraband trade excepted in all cases), that have or shall come to the hurt, detriment or damage of the said goods and merchandise, or any part thereof."

This contention, again, Defendant asks the Court to strike in paragraph No. 3 of its Motion. One of the grounds of this Motion to Strike is based upon the FPA clause of the Refrigeration Insurance Rider, which this Court has already sustained ante, but the motion is also based on the additional contention that the flooding of the hold was caused by the failure of an intake pipe "as a result of corrosion and electrolysis; this entry of water so caused was not a peril of the sea as a matter of law." Again, this Court is constrained to sustain the Defendant's contention that as a matter of law the entry of water as a result of the failure of the pipe caused by electrolysis or corrosion is not a "peril of the sea,"

19. Dover, Analysis of Marine & Other Insurance Clauses (1960) p. 50.
Ferrante v. Detroit Fire & Marine Insurance Co., (S.D.Calif.1954) 125 F.Supp. 621.
The Bill (D.Md.1942) 47 F.Supp. 969, 978.
Reisman v. New Hampshire Fire Ins. Co. (5 Cir. 1963) 312 F.2d 17, 20–21.
Tropical Marine Prod. Inc. v. Birmingham Fire Ins. Co. (5 Cir. 1957) 247 F. 2d 116, 120–122, 123.

Plaintiff relied upon an excerpt from this case out of context as apparently laying down a test of a latent defect, based solely upon whether or not the defect could have been discovered. The facts do not support this.
The Feltre (9 Cir. 1929) 30 F.2d 62.
General American Transportation Co. v. Sun Insurance Office (D.C.Tenn.1965) 239 F.Supp. 844, 846.

but was merely wear and tear.[20] Under these circumstances, the damage, if any, to the 11 tierces caused by this flooding due to the falling off of the suction pipe would not constitute a loss caused by a peril of the sea; but as indicated elsewhere in this decision, there is a failure of substantial evidence to prove even that the damage in question was caused by the flooding.

In his contention 1(d), the Plaintiff claims that a combination of events, including the log collision of May 22, the "burning" of the vessel on June 29th, the stranding of the vessel on July 13th, and the "sinking" of the vessel on August 24th caused such damage to the vessel and its engines as to prevent the engineer from giving proper or sufficient attention to the maintenance of prescribed temperatures in the Number One hold "and such events, therefore, either directly caused the loss or caused a derangement under the refrigeration insurance provision of the policy * * *". Likewise, it has been contended in this connection by the Defendant that none of the events preceding the taking on of the 21 tierces on July 10, 1964, would constitute an insured cause of the damage to the tierces even if it could be demonstrated that they had some effect on the spoiling of this cargo.

It is extremely doubtful that evidence as to the log collision or burning could be even adduced before a jury—had this case come to trial—since they occurred before the cargo was received on board the vessel. It must be remembered that the Court is here dealing with the Refrigeration Insurance Rider, which applies to all of the refrigerated cargo of all vessels and assureds covered from time to time by this open-end policy, and therefore includes the D/V Aleutian Reefer and the assured Plaintiff, Alf Larsen; and that the Court is not here construing those portions of the policy,

included in sub-section (b) of Section 12 of the policy, which were inserted therein immediately preceding the Refrigeration Insurance Rider on page 3 of the policy, and as to which the following comments apply:

Paragraph 12 of the main policy is entitled, "Average Terms" and starts off, at the top of page 3, with a sub-section (a), covering cargo "On deck and subject to an 'On Deck' Bill of Lading," etc., a clause not here applicable. Then follows sub-section (b) which, in its original printed form, contained only one printed line reading as follows:

"(b) EXCEPT WHILE SUBJECT TO AN 'ON DECK' BILL OF LADING:—";

and the rest of the page, comprising more than half of this page 3, was apparently originally blank. There was then written, immediately following this printed line, a typewritten statement reading as follows:

"CANNERY SUPPLIES AND MATERIALS, Northbound, and Processed Salmon and crab meat, southbound, insured:"

and then, underneath the same, in the left margin, the words "D/V 'MEDINA':". Then follows a special FPA clause in red ink, obviously applicable only to the D/V Medina, and stamped on by a rubber stamp, reading as follows:

"Warranted free from Particular Average, under three percent on each shipping package, unless the vessel or craft be stranded, sunk or burnt, but notwithstanding this warranty the Assurers are to pay the insured value of any package or packages which may be totally lost in loading, transhipment or discharge, also for any loss of or damage to the interest insured which may reasonably be attributed to fire, collision or contact of the vessel and/or

---

20. 2 Arnould, supra, Sec. 816, 10 British Shipping Laws 771–772. Founders' Ins. Co. v. Rogers (9 Cir. 1960) 281 F.2d 332, 339; 305 F.2d 944, 948, 98 A.L.R.2d 945. See also authorities under Note 19.

craft and/or conveyance with any external substance (ice included) other than water, or to discharge of cargo at port of distress, also to pay landing, warehousing, forwarding and special charges if incurred for which underwriters would be liable under a Policy covering Particular Average."

Immediately following this stamped FPA clause is another typewritten addendum reading as follows:

"DV 'BARBARA LEE' and DV 'MARTIN', and CANNERY TENDERS:"

followed again by a red-stamped special FPA clause identical in wording with the one just quoted, and obviously applicable only to the DV "BARBARA LEE" and the DV "MARTIN" and Cannery Tenders.

The Plaintiff, in his contention No. 5, relies upon one or both of these redstamped FPA clauses, along with other contentions, and seeks to recover on the ground that the losses exceed three percent; and further, that by the language of these particular FPA clauses, the particular average limitations is waived merely if the vessel is "stranded, sunk or burnt" (the English version of this FPA warranty), as compared to the American version of the clause which requires that the damage must be "directly caused by the vessel being stranded, sunk, burnt," etc. The English version seems to have been interpreted most broadly in favor of the assured so that if it be shown that at least after the cargo in quesiton was taken on there was a stranding, sinking or burning, the FPA limitation would be waived regardless of whether the stranding, sinking or burning had any actual effect in damaging the goods.[21] On the other hand, the American clause obviously requires direct causation of the damage by the stranding, sinking or burning. The Plaintiff seeks to escape this conclusion that the two special redstamped FPA clauses are not applicable to the DV Aleutian Reefer or the Plaintiff, Alf Larsen, by contending that the policy is ambiguous in this respect, and that in case of ambiguity, all doubt should be resolved in favor of the insured as against the insurer. The Court finds that a careful reading and inspection of the policy as a whole, including all riders attached thereto immediately under the title page of the policy, eliminates any ambiguity in this respect, and that the two red-stamped special FPA clauses clearly do not apply to the DV Aleutian Reefer or to Plaintiff Larsen.

In this connection, as the Court's previous oral remarks indicate, there are six riders, each on a separate sheet or half sheet, which were obviously added to the policy after its original issuance, by removing the title sheet and placing them above and preceding page No. 2 of the policy, and then pinning back page 1 or the title sheet of the policy so as to include all of these riders as addenda to the policy. Each one of these riders contains, at the bottom thereof, in identical or substantially identical language, the words, in prominent capitals, "ALL OTHER TERMS, CONDITIONS, AND VALUATIONS REMAINING UNCHANGED." It seems obvious, therefore, that when each of these six riders was attached, it applied only to the vessel or vessels, or the assureds and/or additional assureds mentioned in such rider, who were covered under the date of each such rider set forth at the top of each of the same, and that each successive rider attached on a successive date was intended *not* to include all the preceding riders, but only the applicable general provisions of the main policy to which it was attached. Thus, it cannot be reasonably contended that the last two riders (relating to the D/V Aleutian Reefer and Alf Larsen) attached to the policy under the respective dates of April 28, 1964, and May 15, 1964, incorporated by reference the preceding four riders, of which the one dated June 13, 1963, contained also a red-stamped FPA clause

---

21. See Notes 17 and 18.
 Pacific Creosoting Co. v. Thames & Mersey Marine Ins. Co. (W.D.Wash.1911) 184 F. 947, 949.

referring to the P/B "MARTEN", effective June 6, 1963, and phrased in language identical with the two red-stamped riders contained in Section 12(b) on page 3 of the main policy hereinabove mentioned. Hence, the red-stamped FPA clause in said rider dated June 13, 1963, certainly does not apply to the Aleutian Reefer or the Plaintiff Larsen.

Moreover, when one considers the context and general appearance of the first two red-stamped FPA clauses in Section 12(b) of the main policy, as hereinabove discussed, together with the additional riders inserted above page 2 of the policy, and the fact that this is a Marine Open Cargo Policy intended to remain effective from year to year, or until canceled by one or the other party, with the necessity, from time to time, of adding new vessels, cargoes, and assureds, it must be obvious that the two red-stamped FPA clauses in said Section 12(b) were not intended to be incorporated by reference insofar as concerned the Aleutian Reefer or Mr. Alf Larsen by the general language stamped on the bottom of the last two sheets added to the policy, as aforesaid, reading: "ALL OTHER TERMS, CONDITIONS, AND VALUATIONS REMAINING UNCHANGED." This eliminates Plaintiff's contention No. 5, on page 12 of the Pretrial Order, which seeks to take advantage of one or the other of these three red-stamped FPA warranties. This makes it unnecessary for the Court to rule, as it would if such ruling were necessary, that nevertheless, even if such red-stamped FPA warranties were applicable, there could be no recovery because the loss was not apportionable. The conclusion is that these special red-stamped FPA warranties were not applicable to the Aleutian Reefer and Mr. Larsen on the further ground that the Refrigeration Insurance Rider, which is a general rider, obviously was intended to cover the whole field of this refrigerated cargo insofar as an FPA warranty was concerned.

As to Plaintiff's contention No. 3, (Pretrial Order, pages 10 and 11) and paragraph 8 of Defendant's Motion to Strike the same, relating to the claim for legal expenses in suit in the action against the carrier, said motion is granted on the ground that as a matter of law, Clause 34 of the policy is inapplicable and insufficient to constitute a basis for recovery by the Plaintiff since such recovery is predicated upon the Plaintiff having a loss "otherwise recoverable" under the policy, and this Court has ruled that the Plaintiff is not entitled to recover under the policy.

As to Plaintiff's contention No. 10 (Pretrial Order pages 13–14) and Defendant's Motion to Strike, paragraph 11, in connection with which the Defendant claims that Plaintiff is precluded by breach of warranty in connection with presenting a proper claim, etcetera, against the carrier, the Defendant's Motion to Strike is denied, the Court feeling that the facts available are insufficient to enable the Court to determine this issue as a matter of law.

As to Plaintiff's contention No. 8 (Pretrial Order, page 12) and Defendant's Motion to Strike, paragraph 10, although it is unnecessary to determine this question, the Court reiterates its previous oral statement that were damages recoverable under the policy, the recoverable price would be $800.00 per tierce and not $800.-00 plus 10 percent for each of the damaged tierces, in accordance with Section 8 of the policy.

The Court incorporates by reference its oral remarks in open court on July 23, 1965, as additional grounds for its decision herein. The Court has considered Plaintiff's Motion for Reconsideration of Court's Oral Opinion and Offer of Proof filed herein on July 27, 1965, and finds no reason to alter its conclusions herein stated.

Having found that the Defendant's Motion to Strike should be granted, except as to immaterial issues, and that, considering the same as a Motion for Summary Judgment, the pleadings, depositions and admissions on file, together with the affidavits and other circumstances hereinabove mentioned, show that there is no genuine issue as to any mate-

rial fact and that the Defendant is entitled to a judgment as a matter of law, said Motion for Summary Judgment is granted. A form of judgment will be prepared by Defendant's counsel in accordance with this decision, and submitted to the Plaintiff's counsel for approval as to form and submitted to this Court for its signature. Judgment will not be deemed to have been entered until such judgment has been filed.