**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 11 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

COMMERCIAL UNION INSURANCE
COMPANY,

      Plaintiff - Appellee,

v.

      No. 99-3393

SEA HARVEST SEAFOOD
COMPANY,

      Defendant - Appellant.

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 99-CV-2007-KHV)**

Jess B. Millikan, Derby, Cook, Quinby & Tweedt, LLP, San Francisco, California (John
M. Duggan and Deron A. Anliker, Duggan, Shadwick & Doerr, Overland Park, Kansas,
with her on the brief) for Plaintiff - Appellee.

Lindsay L. Wood (Rebecca S. Bihr, Swanson Midgley, LLC, Kansas City, Missouri, with
him on the briefs) for Defendant - Appellant.[*]

Before **HENRY**, Circuit Judge, **MURPHY**, Circuit Judge, and **MILLS**, District Judge.[**]

---

[*]In an Order filed March 7, 2001, this Court granted the motion of Lindsay L.
Wood and Rebecca S. Bihr to withdraw as counsel.

[**]The Honorable Richard Mills, United States District Judge for the Central
District of Illinois, sitting by designation.

**MILLS**, District Judge.

We deal here with 36,000 pounds of decomposed frozen shrimp.

This appeal is taken from an order granting summary judgment to Plaintiff-Appellee Commercial Union Insurance Company ("Commercial Union") on its action for a declaratory judgment pursuant to 28 U.S.C. § 2201 and denying partial summary judgment to Defendant-Appellant Sea Harvest Seafood Company ("Sea Harvest") on Count I of its counterclaim which alleged breach of contract.[1]

## I. FACTS AND PROCEDURAL HISTORY

On July 30, 1996, Commercial Union issued a policy of ocean marine cargo insurance to Sea Harvest. The policy provided that shipments of frozen shrimp would be insured pursuant to the refrigeration clause. The refrigeration insurance endorsement provided:

> Perishable Cargo requiring temperature control is insured against:
> (1) All Risks of physical loss or damage from any external cause but excluding:
> A. Deterioration, decay or spoilage unless the Assured can demonstrate that such damage was directly caused by derangement or breakdown of the refrigeration machinery or directly caused by the vessel stranding, sinking, burning or in collision.

On October 30, 1998, Sea Harvest declared a shipment of 3,600 cartons of frozen shrimp

---

[1]Count II of Sea Harvest's counterclaim has since been dismissed. Accordingly, the district court's judgment appealed from disposed of all issues as to all parties.

under the policy. Sea Harvest contracted with Sea-Land Service Inc. ("Sea-Land") to transport the shrimp from Bangkok, Thailand, to Philadelphia, Pennsylvania. Sea-Land agreed to maintain the shrimp at -4 degrees F in the cargo container during shipment. The shrimp shipment arrived in California on November 2, 1998. Several days later, the shrimp was sent to Chicago via Union Pacific Rail. The shipment arrived in Chicago on November 16, 1998. It was then transferred to the CSX terminal before departing for Philadelphia. At some point during the transfer, Sea-Land failed to attach a gen-set to the cargo container with the shrimp. The gen-set is a device which provides electrical power to the refrigeration unit on the cargo container. Before the shipment arrived in Philadelphia, Sea Harvest was notified by a Sea-Land representative that the cargo container left Chicago without a gen-set attached.

On November 18, 1998, Sea Harvest made a claim to Commercial Union pursuant to the ocean marine cargo insurance policy for the value of the shrimp. The claim under the policy was for $230,005.79, which represented the entire value of the shipment based upon Sea Harvest's contention that it was damaged in transit and rendered a total loss. The following night, the shrimp arrived in Philadelphia. At the direction of Commercial Union, Scott Esslinger of Luard & Company inspected the shipment. He concluded that the shipment had been without refrigeration for two and one half days. His report stated as follows:

> In the single carton opened for examination of the contents (taken from the top tier of the rear row) we noted no apparent heavy ice or frost inside the

plastic bags. Individual shrimp had well defined ridges. They appeared to be fairly evenly distributed throughout the bags, and did not appear to be frozen together in large clumps at the bottom of the bags, as we might expect had they thawed out and been refrozen.

When Esslinger examined the container, the temperature ranged from 4 degrees below Fahrenheit to 1.5 degrees Fahrenheit.

Testing was done on selected portions of the shipment by both Certified Laboratories and Michelson Laboratories. Both laboratories found some degree of decomposition in the shrimp samples tested. Under FDA guidelines, any decomposition of frozen shrimp is unacceptable and renders the shrimp unfit for human consumption. The shipment was therefore eventually ordered to be destroyed.

On January 7, 1999, Commercial Union denied the Sea Harvest claim, except for the value of seven cartons that were not included in the shipment.[2] Commercial Union subsequently notified Sea Harvest of its decision. On January 8, 1999, Commercial Union commenced an action for declaratory judgment, contending that it does not owe Sea Harvest's claim under the maritime insurance policy. Commercial Union alleged that the claim was denied for two reasons: (1) Sea Harvest did not establish that the shipment was in good condition when the coverage attached as required by the policy; and (2) the

---

[2]Commercial Union tendered Sea Harvest a check for $446.61 to cover the value of the seven short cartons. The check included a restrictive endorsement. Because Sea Harvest interpreted the restrictive endorsement as a waiver of all claims, it did not endorse the check. Commercial Union contended that the endorsement applied solely to the claim for the shortage of the seven cartons and offered to reissue the check. It is unclear as to whether the check was reissued and endorsed.

policy excluded coverage of the claim.

Sea Harvest warranted in the policy that "the interest insured hereunder is in good condition at the commencement of the coverage." The parties dispute whether Commercial Union requested that Sea Harvest provide proof that the shrimp shipment was in good condition at the commencement of coverage. It is clear that Commercial Union did not conduct its own independent investigation to determine whether the shrimp was in good condition when coverage attached. Commercial Union points out, however, that Sea Harvest had the burden of demonstrating that the shrimp was in good condition when coverage commenced. Sea Harvest president Shin Quo Lee asserts that Sea Harvest provided proof that the shipment was in good condition from the outset of coverage in the form of quality control certifications from the supplier. Rebecca Galloway, Commercial Union's regional claims manager, denies that quality control certifications were provided by Sea Harvest. She notes that she did not see the certifications until her deposition on August 11, 1999.

On August 13, 1999, Commercial Union moved for summary judgment on its action for declaratory relief. Sea Harvest moved on August 27, 1999, for partial summary judgment on its breach of contract claim. On November 2, 1999, the district court entered an order granting Commercial Union's motion and denying Sea Harvest's motion. The district court determined that under admiralty law, the failure to attach a gen-set did not constitute a "derangement or breakdown of the refrigeration machinery" and therefore

was excluded pursuant to the policy. Because the court determined that the policy precluded coverage, it did not reach Commercial Union's other proffered justification that Sea Harvest failed to establish that the shipment was in good condition when coverage attached.

## II. STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. See Byers v. City of Albuquerque, 150 F.3d 1271, 1274 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Pursuant to this standard, we review the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party. See Byers, 150 F.3d at 1274.

## III. ANALYSIS

Sea Harvest asserts that the district court erred in determining that admiralty law applies to the interpretation of the insurance policy and in granting Commercial Union's motion for summary judgment. Sea Harvest further contends that Kansas law should apply to this matter. Sea Harvest argues that the word "derangement" as used in the insurance policy is ambiguous and that the policy therefore does provide coverage for the railroad's failure to attach the gen-set to the container. While Sea Harvest concedes that

the result would be questionable pursuant to admiralty law, it alleges that there is no question that the loss of the shrimp would be covered under the applicable state law because of rules governing the construction of ambiguous contracts. Commercial Union maintains that the district court was correct in applying admiralty law. Nevertheless, Commercial Union asserts that the result would have been the same under the applicable state law.

We will first address the choice of law issue. In seeking declaratory relief, Commercial Union invoked the district court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333. Sea Harvest's counterclaim alleged that jurisdiction was proper pursuant to 28 U.S.C. § 1332 in that there is complete diversity between the parties and the amount in controversy exceeds $75,000.00. The district court eventually concluded that admiralty jurisdiction was proper in this dispute.

Initially, Sea Harvest contends that the bill of lading terminated at the "port of discharge" at Los Angeles. Thus, transportation beyond this point was subject to a separate inland bill of lading. Sea Harvest also notes that the warehouse to warehouse clause of the Marine Open Cargo Insurance Policy provides that "the insurance continues whilst the goods are in transit and/or awaiting transit delivered to final warehouse at the destination named in the Special Policy or Declaration or until the expiry of 15 days." Sea Harvest therefore notes that this clause emphasizes that the policy consists of both maritime and non-maritime obligations and coverage. At the very least, Sea Harvest

contends that the Court should view the transaction as a "mixed contract" which included both maritime and non-maritime obligations. Sea Harvest maintains that admiralty jurisdiction is generally not present in such instances. Moreover, the loss at issue clearly occurred during the inland portion of the shipment and because of the significance of the land transportation, it cannot be said that this portion was incidental to an otherwise maritime contract. Thus, Sea Harvest contends that the insurance policy should be analyzed according to the applicable state law pursuant to diversity of citizenship jurisdiction.

Commercial Union emphasizes that the contract at issue is maritime in nature. Thus, Sea Harvest's arguments concerning the terms of the bill of lading are irrelevant. Rather, this dispute concerns the obligations assumed in the insurance policy. Moreover, Commercial Union notes that the policy expressly applies to shipments between the Far East and the United States. The premium is calculated to reflect this. While it is true that the policy also insures cargo during transportation from a vessel to a final inland destination, this does not rise to the level of a completely separate coverage to which non-maritime law should apply. Additionally, Commercial Union notes that Sea Harvest submitted its claim under a "Refrigeration Insurance" endorsement that does not specifically pertain to losses on land. In any event, Commercial Union contends that the warehouse to warehouse clause which governed the inland portion of the shipment was merely incidental to the overall maritime nature of the policy. Moreover, Commercial

Union emphasizes that there is no evidence in the record which indicates that it was aware that the shipment's ultimate destination was Philadelphia. The premium was calculated solely on the basis of the transportation of the shrimp from Thailand to California which involved only ocean carriage. Commercial Union alleges that this shows that the warehouse to warehouse clause was merely incidental to the overwhelmingly maritime nature of the policy. The fact that the shrimp was transported by rail after its shipment by sea does not negate the overall maritime nature of the policy. Accordingly, Commercial Union contends that the district court properly applied admiralty law.

The Tenth Circuit has not addressed the issue of whether admiralty law applies to the interpretation of a marine insurance policy when the loss occurs during the inland portion of the shipment. Other circuits have concluded that disputes pursuant to marine insurance contracts are governed by federal admiralty law when an established federal rule addresses the issues raised. See Kiernan v. Zurich Co., 150 F.3d 1120, 1121 (9th Cir. 1998); Ingersoll Milling Machine Co. v. Bodena, 829 F.2d 293, 305 (2d Cir. 1987); All Underwriters v. Weisberg, 222 F.3d 1309, 1312 (11th Cir. 2000). In the absence of a controlling federal rule, a federal court may fashion a rule in certain circumstances. See Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 314 (1955). However, this practice is not favored. See id. at 316. State law controls disputes involving maritime insurance policies only "in the absence of a federal statute, a judicially fashioned

admiralty rule, or a need for uniformity in admiralty practice." Bohemia, Inc. v. Home Ins. Co., 725 F.2d 506, 510 (9th Cir. 1984).

It is clear that there is no federal statute that is applicable to the instant situation. Commercial Union contends that there does exist a judicially-fashioned admiralty rule that is directly on point. Specifically, it cites two Ninth Circuit cases, Larsen v. Ins. Co. of North America, 252 F. Supp. 458 (W.D. Wash.) ("Larsen I"), aff'd, 363 F.2d 261 (9th Cir. 1966) ("Larsen II"); Suma Fruit Int'l v. Albany Ins. Co., 122 F.3d 34 (9th Cir. 1997), that have reviewed the very language that is at issue here as it appears in marine insurance policies. These cases were the basis for the district court's order granting summary judgment to Commercial Union.

Initially, we note that Sea Harvest does not contest on appeal that the decomposition of the shrimp constituted "[d]eterioration, decay or spoilage" within the meaning of the policy. Rather, Sea Harvest contests the propriety of admiralty jurisdiction and the district court's interpretation of "derangement or breakdown of the refrigeration machinery." It is this language that is the subject of the Ninth Circuit's judicially-fashioned admiralty rule. Resolution of this case therefore turns on this language.

In Larsen II, the Ninth Circuit interpreted the meaning of "derangement or breakdown of the refrigerating machinery" as that language appeared in a marine insurance policy. 362 F.2d at 262. That case concerned a cargo of salmon, a portion of

which was determined to be spoiled. See Larsen I, 252 F. Supp. at 461. Apparently, the refrigeration machinery was in good working order and would have functioned properly had the crew not been negligent in failing to monitor the temperature. See id. at 474. Nevertheless, the insured asserted that this constituted a "derangement" of the refrigerating machinery and should therefore be covered under the policy. The district court interpreted the language in the following manner:

> [I]n order to be deranged, machinery must have some functional disorder in its own operation, as distinguished from a simple failure to operate at all or an operation at an improper or insufficient rate of production or operation, due solely to the manner in which human beings in charge of the same choose to operate or not to operate it.

Id. at 475.

The court therefore concluded that there was no derangement of the machinery and that the loss was not covered. See id. The Ninth Circuit upheld the determination of the district court. See Larsen II, 362 F.2d at 263.

In Suma, the Ninth Circuit addressed language in a marine cargo insurance policy that is almost identical to the language found in the policy at issue in this case.[3] That case involved a portion of a shipment of sweet onions that had deteriorated in transit when the

---

[3]The policy in Suma insured against:
"All risks of physical loss or damage from any external cause but excluding:
1. Deterioration, decay, or spoilage unless the assured demonstrates that such damage is caused by derangement or breakdown of the refrigeration equipment, or the vessel stranding, sinking, burning, or being in collision."

122 F.3d at 35.

carrier did not properly set the fresh air vents on the refrigeration units of the storage containers. See id. at 35. The insurer rejected the insured's claim, determining that the carrier's failure to set the fresh air vents correctly was not a "derangement" of the refrigeration machinery. See id. The court held that because human failure to operate the equipment at the proper capacity was the reason for the loss, it could not be said that the damage was caused by the "derangement or breakdown of the refrigerating machinery." See id. at 36, quoting Larsen II, 362 F.2d at 263. The Ninth Circuit went on to hold that "Larsen constitutes a judicially-fashioned admiralty rule that uniformly provides that the term 'derangement or breakdown of the refrigerating machinery,' as the term is used in marine insurance contracts, applies to losses caused by mechanical disorders of refrigeration equipment." Id. at 36, quoting Larsen II, 362 F.2d at 263. It therefore determined that the district court correctly applied the rule in Larsen to conclude that the insured's losses were not covered by the insurance policy. See id. at 36.

The district court adopted the Ninth Circuit's reasoning in Suma, concluding that under established admiralty law the term " 'derangement or breakdown of the refrigerating machinery,' as the term is used in marine insurance contracts, applies to losses caused by mechanical disorders of refrigeration equipment." Commercial Union v. Sea Harvest, 75 F. Supp.2d 1264, 1270-71 (D. Kan. 1999), quoting Suma, 122 F.3d at 36. The court therefore granted Commercial Union's motion for summary judgment on its declaratory judgment action and denied Sea Harvest's motion for partial summary

-12-

judgment.  See id. at 1271.

We agree with the district court and the Ninth Circuit and hold that the term "derangement or breakdown of the refrigeration machinery" as used in marine insurance contracts does not apply to the failure to operate the refrigeration equipment.  Rather, it refers to "losses caused by mechanical disorders of refrigeration equipment."  Suma, 122 F.3d at 36.  We therefore adopt this judicially-fashioned admiralty rule.  Here, it is undisputed that the reason for the decomposition of the shrimp is the human error in failing to attach the gen-set to the container.  It is clear that there were no mechanical disorders with the refrigeration equipment.  Accordingly, the loss of the shrimp falls within the policy's exclusion.

We are mindful that there is one major distinction between the instant matter and the two Ninth Circuit cases on which we rely.  Here, the decomposition of the shrimp clearly occurred in Chicago on the overland portion of the transportation.  Conversely, the loss in both Larsen and Suma occurred during the marine portion of the shipment.  See Larsen II, 362 F.2d at 262; Suma, 122 F.3d at 35.  It was once the case that admiralty jurisdiction was said to be reserved to "contracts, claims, and services purely maritime." Rea v. The Eclipse, 135 U.S. 599, 608 (1890).  Courts have since recognized exceptions to this general rule.  Today, some courts allow for the presence of admiralty jurisdiction in the following instances: (1) when there is a dispute over a contract that is not entirely maritime provided the non-maritime elements are "incidental" to a primarily maritime

purpose; or (2) when the severable maritime portions of a mixed contract that is not primarily maritime can be separately litigated without prejudice to the overall contract. See Sirius Ins. Co. Ltd. v. Collins, 16 F.3d 34, 36 (2d Cir. 1994); Berkshire Fashions, Inc. v. M.V. Hakusan II, 954 F.2d 874, 880 (3d Cir. 1992); Kuehne & Nagel v. Geosource, Inc., 874 F.2d 283, 290 (5th Cir. 1989); Simon v. Intercontinental Transport (ICT) B.V., 882 F.2d 1435, 1442 (9th Cir. 1989). Because the decomposition of the shrimp did not occur during the maritime portion of the shipment, it is clear that the second exception would not apply.

Sea Harvest argues that this is a mixed contract and that the first exception is also inapplicable. In making this argument, Sea Harvest relies in part on the Second Circuit's decision in Atlantic Mutual Ins. Company v. Balfour Maclaine Int'l Ltd., 968 F.2d 196 (2d Cir. 1992). The claim in Balfour involved the loss of 165,564 bags of coffee that had allegedly been stored at various warehouses in Mexico. See id. at 197. Although the insurance policy was called a "Marine Open Cargo Policy," its coverage extended to goods which were stored at Mexico warehouses and goods being transported within the United States. See id. at 197-98. The insurer contended that the overall maritime nature of the contract implicated the court's admiralty and maritime jurisdiction. See id. at 198. The Second Circuit concluded that barring the presence of the aforementioned two exceptions, admiralty jurisdiction is not proper unless the contract is wholly maritime in nature. See id. at 199. The court went on to note that in assessing the propriety of

admiralty jurisdiction, a federal court must first ascertain whether the subject matter of the dispute is so attenuated from maritime commerce that it does not implicate the interests underlying admiralty and maritime jurisdiction. See id. at 200, citing Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 608 (1991). The Second Circuit emphasized the fact that the goods never "became marine cargo and never entered the maritime stream of commerce." Id. at 200. The court therefore determined that the coffee's connection with maritime commerce was "too speculative and attenuated" to support admiralty and maritime jurisdiction. See id.

We are not persuaded by Sea Harvest's reliance on Balfour. Like Balfour, the instant case involved a "Marine Open Cargo Policy." However, this case involved significant maritime travel. Indeed, the shipment from Bangkok to Los Angeles was clearly the predominant part of the transaction. This contrasts with the situation in Balfour in which the coffee did not even enter the maritime stream of commerce. See id. at 200. Thus, unlike Balfour, the shrimp shipment's connection to maritime commerce is not too speculative to justify admiralty and maritime jurisdiction. The shipment crossed the Pacific Ocean on its way from Bangkok to Los Angeles before reaching its ultimate destination of Philadelphia via train. Moreover, as Commercial Union notes, Sea Harvest submitted its claim under the "Refrigeration Insurance" endorsement which does not distinguish between losses on land and losses at sea. It is true that the warehouse to warehouse clause of the policy contemplates that there may be land travel. The relevant

-15-

part provides that "the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to final warehouse at the destination named in the Special Policy or Declaration or until the expiry of 15 days." Thus, it is clear that the insurance coverage did not terminate when the shrimp reached the "port of discharge" as indicated on the bill of lading of Los Angeles. However, because of the key factual distinctions between the present case and Balfour, we are not persuaded by the Second Circuit's reasoning.

Relying on Berkshire Fashions, Sea Harvest argues that when the inland portion of a mixed maritime and non-maritime contract is significant, as it is here, it will not be considered incidental and admiralty law will not apply to losses on land. See id. at 881. However, as Commercial Union notes, the record does not indicate that it was aware that the shipment's ultimate destination was Philadelphia. Commercial Union emphasizes that its premium was calculated on the basis of the transportation of the shrimp from Thailand to California via cargo ship. It notes that no separate premium was charged for the land transportation. Thus, Commercial Union argues that from its perspective, it made no difference whether the shrimp was being transported across country or across town. It was insured as marine cargo for transportation by cargo ship. It is clear that Sea Harvest entered into a separate contract with Sea-Land for transportation of the shrimp from Los Angeles to Philadelphia. However, because of the warehouse to warehouse clause, the shipment was insured by Commercial Union. The question therefore becomes whether the warehouse to warehouse clause of a marine open cargo insurance policy will take the

-16-

instant dispute out of a court's admiralty jurisdiction when the loss occurs during the inland portion of the shipment.

We do not think that the warehouse to warehouse clause is enough to take this dispute out of the court's admiralty jurisdiction in this instance. As Commercial Union notes, the shipment was insured as "Ocean Cargo." Moreover, the warehouse to warehouse clause is found in the portion of the policy entitled "Marine Open Cargo Policy." It is true that the shipment was subject to a "thru (sic) bill of lading." A "through bill of lading" is one in which the carrier transports the goods from the point of origin to destination, even though different carriers may be used to perform the various portions of the shipment. See Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 552 n. 2 (2d Cir. 2000), citing Mannesman Demag Corp. v. M/V Concert Express, 225 F.3d 587, 588 n. 3 (5th Cir. 2000). However, the bill of lading does not indicate that the shrimp's ultimate destination was Philadelphia. Instead, it designates "Los Angeles, CA, USA" as the "port of discharge" and "place of delivery by on-carrier." Thus, it appears from the bill of lading that Los Angeles was the point of destination. The only indication that the shipment would ultimately be transported to Philadelphia is an invoice faxed to Sea Harvest from Sea-Land on October 27, 1998. It indicates the destination of "Philadelphia, PA." However, the record reflects that Commercial Union calculated its premium based solely on the bill of lading which provided only for ocean carriage. No separate premium was charged for the cross-

country land transportation. The policy was therefore of an overwhelmingly maritime nature with the shipment from Bangkok to Los Angeles clearly being the predominant part of the transaction. Because the bill of lading contemplates only maritime travel, Sea Harvest's claim sounds only in the warehouse to warehouse clause. Although the warehouse to warehouse clause clearly provides that the insurance continues during the land travel, it is nevertheless incidental to the overall maritime nature of the policy.

Recently, the Second Circuit addressed the issue of what law to apply to the loss of cargo during shipment that includes both water and land transportation on a single bill of lading. See Hartford, 230 F.3d at 552. In Hartford, the "through bill of lading" involved the shipment of goods from Oconomowoc, Wisconsin, to Spijkenisse, The Netherlands. See id. The bill of lading indicated that the container would travel by land from Oconomowoc to Montreal, by sea from Montreal to Antwerp, Belgium, and by land from Antwerp to Spijkenisse. See id. at 555. Moreover, the bill specifically designated the carrier for the maritime portion of the shipment and noted that other carriers would transport the container for the land portions of the carriage. See id. at 552. The court emphasized the significance of the overland transportation, noting that the bill of lading required land travel through four countries using multiple modes of transportation. See id. at 556. The court took judicial notice that the overall land travel under the bill of lading amounted to at least 850 miles. See id. The Second Circuit determined that this was more than "incidental" to the maritime portion of the carriage and was therefore not

-18-

within its admiralty jurisdiction.  See id.

The instant matter differs significantly from the situation in Hartford.  As we have noted, it is not clear from the bill of lading that any land transportation is necessary.  Here, the bill contemplates only ocean carriage.  The only indication of the shrimp's ultimate destination is an invoice faxed to Sea Harvest from Sea-Land.  Presumably, Sea Harvest had informed Sea-Land that the shrimp was to be transported to Philadelphia prior to its arrival in Los Angeles.  Sea-Land then sent the invoice on October 27, 1998, notifying Sea Harvest of the shipping charges.  Nevertheless, there is no indication from the bill of lading that any land transportation is required.  Conversely, the bill of lading in Hartford specifically noted that significant land transportation would be necessary.  See Hartford, 230 F.3d at 555-56.  In determining that the land portion was not merely "incidental" to the sea carriage, the Second Circuit emphasized the land segment pursuant to the bill of lading.  See id.  Here, because the bill of lading contemplates only maritime travel, we decline to follow Hartford.

We are not persuaded by the cases relied upon by Sea Harvest in arguing that the contract contained significant non-maritime elements.  Sea Harvest cites The Ciano, 63 F. Supp. 892 (E.D. Pa. 1945) for the proposition that when a contract involves both maritime and non-maritime subjects and is divisible, only the maritime portion of the contract is governed by maritime law.  See id. at 894.  However, as we have noted, the only non-maritime portion of the contract that is relevant here is the warehouse to warehouse clause

which merely contemplates the possibility of inland transportation. Moreover, the facts of The Ciano are easily distinguishable from the instant matter. In The Ciano, the bill of lading which covered the cargo was issued from Port of Cadiz, Spain, to Minneapolis, Minnesota, via Philadelphia. See id. at 893. Thus, as in Hartford, the bill of lading specifically indicated that land transportation would be required. It was clear that the loss occurred while the merchandise was being transported from Philadelphia to Minneapolis and that the asserted cause of action was maintained against the rail carrier pursuant to its own bill of lading. See id. The court concluded that the inland transportation was not merely incidental to the maritime portion of the transaction, emphasizing that the only relevant contract was the railroad's bill of lading which did not involve any maritime transportation. See id. at 895. This obviously contrasts with the instant matter. Here, it is not clear from the bill of lading that any inland transportation would be required. Although Sea Harvest entered into a separate contract with Sea-Land for the cross-country transportation of the shrimp, the record is clear that Commercial Union based its premium on the shipment from Bangkok to Los Angeles pursuant to the marine insurance contract. We are therefore not persuaded by The Ciano.

Sea Harvest next cites Berkshire Fashions in contending that a bill of lading in a "mixed contract" case does not give rise to the application of admiralty law when cross-country transportation of goods is involved. 954 F.2d at 881. The Third Circuit reasoned that such extensive inland transportation of goods could not be considered an "incidental"

-20-

portion of the contract. See id. In Berkshire Fashions, the bill of lading indicated that the goods would be transported from Taiwan to New York. See id. at 877. It was not clear, however, whether the goods would be transported merely by sea or by both rail and sea. See id. The Third Circuit concluded that if only sea transportation was contemplated by the bill of lading, then admiralty jurisdiction would be appropriate. See id. at 877-78. However, if the contract called for land and sea carriage, admiralty jurisdiction would not arise. See id. The facts with which we are faced are easily distinguishable from those in Berkshire Fashions. Here, the bill of lading on its face contemplates only maritime travel in transporting the shrimp from Bangkok to Los Angeles via cargo ship. The marine insurance contract makes no mention of the shrimp's ultimate destination of Philadelphia. If the contract had indicated that the shipment's destination was from Bangkok to Los Angeles to Philadelphia, then it would clearly be a "mixed contract" of the type noted in Berkshire Fashions. However, only the warehouse to warehouse clause contemplates the possibility of land travel. We are therefore not persuaded by Sea Harvest's reliance on Berkshire Fashions.

Sea Harvest next relies on Luvi v. Sea-Land Service, Inc., 650 F.2d 371 (1st Cir. 1981), in arguing that land transportation contracts do not fall within admiralty jurisdiction. In Luvi, an oral contract to transport semitrailer cargo containers overland was at issue. See id. at 372. The First Circuit emphasized that the hauler had no contact with a ship and simply picked up the vans at a terminal and drove them to another

-21-

terminal. <u>See</u> <u>id</u>. at 373-74. It therefore concluded that there was no basis to characterize the contract as maritime. <u>See</u> <u>id</u>. at 374. The nature of the marine insurance contract at issue here obviously differs significantly from the contract at issue in <u>Luvi</u>. We therefore find <u>Luvi</u> to be inapposite.

## IV. RECAP

Because of the overwhelmingly maritime nature of the insurance contract, we therefore hold that the district court correctly determined that admiralty jurisdiction was proper. We agree with the Ninth Circuit which held that "<u>Larsen</u> constitutes a judicially-fashioned admiralty rule that uniformly provides that the term 'derangement or breakdown of the refrigerating machinery,' as the term is used in marine insurance contracts, applies to losses caused by mechanical disorders of refrigeration equipment." <u>See</u> <u>Suma</u>, 122 F.3d at 36, quoting <u>Larsen II</u>, 362 F.2d at 263. The language does not apply to the human failure to operate the refrigeration machinery at the proper capacity. <u>See</u> <u>id</u>. The relevant language in the "Refrigeration Insurance" endorsement in the instant matter is almost identical, the only difference being the term "refrigeration machinery" rather than "refrigerating machinery" is used. Moreover, Sea Harvest does not contest on appeal that the district court properly held that the decomposition of the shrimp falls under the exclusion for "[d]eterioration, decay or spoilage." Thus, pursuant to the

language of the policy[4], the loss of the shrimp would be covered only if Sea Harvest could demonstrate that the "damage was directly caused by derangement or breakdown of the refrigeration machinery." It is clear that the damage resulted from the human failure to connect the gen-set. Because this does not constitute a mechanical disorder of the refrigeration equipment under the Ninth Circuit's judicially-fashioned admiralty rule which we adopt, the policy exclusion applies. Having determined that this reason precludes coverage, we will not address Commercial Union's other proffered justification for denying coverage– that Sea Harvest failed to establish that the shipment sustained damage during transit.

## V. CONCLUSION

For the reasons stated above, the district court's grant of Commercial Union's motion for summary judgment is AFFIRMED.

---

[4]Once again, the relevant part of the policy reads:
Perishable Cargo requiring temperature control is insured against:
> (1) All Risks of physical loss or damage from any external cause
> but excluding:
>> A. Deterioration, decay or spoilage unless the Assured can demonstrate that such damage was directly caused by derangement or breakdown of the refrigeration machinery or directly caused by the vessel stranding, sinking, burning or in collision.